## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COLLISION TOWING & AUTO BODY, LLC, *et al.*, | * | |
| Plaintiffs | * | |
| v. | * | Civil Case No. 8:24-603-AAQ |
| PRINCE GEORGE'S COUNTY, MD, | * | |
| Defendant. | * | |

### MEMORANDUM OPINION AND ORDER

This is a case involving a County's temporary closure of an auto body and towing business. Plaintiffs Collision Towing & Auto Body ("Collision Towing") and its former owner, Cornelius Woods, bring suit against Defendant Prince George's County, Maryland, under 42 U.S.C. § 1983 for violations of their Fifth Amendment right to just compensation for deprivation of property and Fourteenth Amendment rights to equal protection and substantive due process under the law. Pending before the Court is Defendant's Motion for Summary Judgment, ECF No. 31.

Plaintiffs' Complaint and Opposition largely focus on procedural deficiencies in Defendant's Nuisance Abatement Board ("NAB"). Plaintiffs specifically take issue with the County's failures to follow some of its own policies regarding the manner in which nuisance complaints are brought before, and ultimately decided by, the NAB. However, importantly, Plaintiffs do not bring any claim for violation of their procedural due process rights. Although the identified deficiencies are concerning, the precedents of this Court and the Fourth Circuit hold that the failure to follow County procedures does not always constitute an unconstitutional taking. Instead of this lawsuit, Plaintiffs' proper means of seeking redress for these violations would have been an appeal of the Nuisance Abatement Board's decision to Maryland Circuit Court—an option

1

Plaintiffs elected not to pursue. For these reasons and the reasons discussed below, the Court shall grant summary judgment to Defendant because Plaintiffs have not shown a dispute of material fact as to whether Defendant deprived them of property in a manner warranting compensation from the government, nor that Defendant subjected them to differential treatment.

## BACKGROUND

The Court begins with a brief overview of the relevant statutory scheme before recounting the case's factual and procedural history.

### I. Statutory Scheme

Prince George's County vests all legislative authority in the City Council, which codifies its regulations in the County Code. Pr. George's Code, § 2-101(b). The City Council established the Nuisance Abatement Board ("NAB") to address public nuisances that "exist in the County in the continuing and recurrent use of certain commercial and residential premises." *Id.* at § 14-170(a). The NAB exercises "the County's police power that is reasonable and necessary in order to protect the health, safety, and general welfare of the citizens" of the County. *Id.* at § 14-170(b). The NAB is comprised of seven members: four citizens and one representative from the Police Department, the Department of Permitting, Inspections, and Enforcement ("DPIE"), and the Fire/EMS Department. *Id.* at § 14-173(a)(2).

The County Code provides the following definitions of nuisances:

Neighborhood nuisance means any premises . . . on or in which, on two or more separate occasions within a one-year period before the start of a proceeding under this subtitle, an owner, tenant or occupant of the premises:

    (a) acts in a disorderly manner that disturbs the public peace; or

    (b) engages in acts, creates or maintains conditions that allows others to act in a disorderly manner that disturbs the public peace; or

(c) engages in activities that are prohibited in residential neighborhoods and zones, including any event, gathering, party, or picnic that involves: admission fees; cover charges; door charges; entry fees; ticket sales; food or beverage sales; adult entertainment charges, fees or sales; personal profit to the homeowner or organizer of an event; or is open to the general public.

Public nuisance shall mean any residential or commercial premises used:

(A) By persons who assemble for the purpose of illegally administering a controlled dangerous substance, as defined in the Criminal Law Article of the Maryland Annotated Code;

(B) For the illegal manufacture or distribution of a controlled dangerous substance, or controlled paraphernalia, as defined in the Criminal Law Article of the Maryland Annotated Code; or

(C) For the illegal storage or concealment of a controlled dangerous substance in sufficient quantity to reasonably indicate under all the circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance or controlled paraphernalia;

(D) By persons for activities involving prostitution, human trafficking, or a criminal gang as defined in the Criminal Law Article of the Maryland Annotated Code;

(E) As a neighborhood nuisance as defined by this Section; or

(F) To endanger life, health, or safety, or obstruct the quiet enjoyment and reasonable use of the property of persons in a particular area.

(G) For the storage or concealment of illegal weapons, stolen property, contraband or other evidence of criminal activity at the premises.

(H) As a disorderly house as referenced in the Criminal Law Article of the Maryland Annotated Code.

(I) By persons for activities involving human labor trafficking as defined in Section 14-191(a)(7) of the County Code.

*Id.* at § 14-171.

The Prince George's County Code lays out the proper procedure for exercising the NAB's power. First, issuing agencies—such as law enforcement agencies and fire departments—may submit petitions alleging nuisance by property owners. *See id.* at § 14-172(b). Submissions of

this type must "include affidavit(s) in support thereof." *Id.* § 14-172(b)(1). "Upon receipt of such

an allegation," the Board provides property owners "notice and an opportunity for a hearing to

determine whether a . . . nuisance exists in the premises." *Id.* § 14-173(b)(3). Then, within ten

days of mailing notice, the Board conducts a public hearing on the complaint during which it

"receive[s] evidence" regarding the property. *Id.* at § 14-173(c)(1). The owner of the property

may defend themselves by arguing the allegations lack sufficient basis or by demonstrating no

nuisance exists. *Id.* § 14-173(c)(2). The issuing agency may also present their case. *Id.* at

§ 14-173(c). If five of seven board members find, by a preponderance of the evidence, that a

nuisance exists and that the owner "failed or refused to cooperate with attempts to abate the

nuisance," it may pursue disciplinary action. *Id.* at § 14-173(c)(4), (d). Specifically, it possesses

authority:

> (A) To order the discontinuance of the public or neighborhood nuisance in the premises where the public or neighborhood nuisance exists; . . .
>
> (B) To order the closing of the premises to the extent necessary to abate the nuisance, and keep it closed for a period not to exceed one (1) year[; and]
>
> (C) To request, for a residential property, the appropriate County department or agency, to exercise authority under Subtitle 13 of the County Code, including but not limited to suspension or revocation of a rental license or creation of a tax lien.

*Id.* at § 14-173(d)(1). Once it comes to a decision, the NAB must issue an order detailing its

chosen course of action. *Id.* § 14-173(d)(2). The order must be posted on the premises at issue;

notice must be provided to the property owner, as well. *Id.* "The Board may vacate the provisions

of [an] order to close if an interested person posts a bond for the period of the ordered

closing . . . and submits reasonably adequate proof to the Board that the nuisance has been abated."

*Id.* Finally, the Code requires the Board to "produce a written decision detailing [its] final order

or action no later than fifteen . . . days after the conclusion of the hearing." *Id.* § 14-171(d)(4).

"Any party aggrieved by a decision of the Board . . . may appeal to the Circuit Court for Prince George's County, Maryland." *Id.* § 14-175.

At the time of Plaintiffs' hearings, the NAB did not always abide by all of their procedures. Although the County Code requires that any petition for a nuisance complaint be accompanied by a sworn affidavit, frequently, affidavits were not provided to members. Pr. George's Code, § 14-172(b)(1); ECF No. 32-1, at 9-10 (testimony of NAB representative stating that during the relevant time, affidavits were not submitted); ECF No. 32-3, at 23 (NAB Chair stating that during the relevant time, the NAB accepted a signature on a submitted petition and did not require it to "actually have an affidavit"). Nonetheless, NAB Members regularly certified that they had reviewed the relevant petition and accompanying affidavit. ECF No. 32-2, at 14-15; ECF No. 32-4.

## II. Factual Background

The Court begins by detailing Plaintiffs' history of business operations then turns to the NAB proceedings at the heart of this dispute.

### A.    History of Collision Towing

Plaintiff Cornelius Woods was the sole owner and resident agent of co-Plaintiff Collision Towing located at 7229 Landover Road in Hyattsville, Maryland (referred to as "the property") from approximately 2013 until 2025. ECF No. 32, at 12; ECF No. 32-9, at 3, 11.

Plaintiffs obtained three use and occupancy permits for the property. The first, issued in July 2009, allowed for an auto repair service with up to four bays. ECF No. 32, at 12. The second, issued in June 2010, provided for a "vehicle storage yard and towing station" for use "related to auto repair." ECF No. 32, at 13; ECF No. 32-6. It included a limitation forbidding "dismantling of wrecked vehicles." ECF No. 32, at 13; ECF No. 32-6. Finally, DPIE issued another permit in

2013, allowing auto body repair for up to four service bays and specifying "no outdoor storage [or] parking" at the premises.  ECF No. 32, at 14; ECF No. 32-7.

Plaintiffs also bid on Prince George's County contracts for towing services.  If the County awarded a business a towing contract, it would be placed on the Police Vendor List.  *See* ECF No. 32, at 33.  According to Mr. Woods, out of thirty-four vendors on the list, only one was Black-owned.  ECF No. 32-9, at 15.  Mr. Woods applied for the list four times; the County never selected Collision Towing.  *Id.* at 16.  At some point, Mr. Woods attended a protest at the Maryland General Assembly and made a public statement against the racial disparity among businesses selected for the list.[1]  *Id.* at 16-17.  Mr. Woods believes at least one DPIE official was physically present at the protest and heard his speech.  *See id.*; ECF No. 32, at 19.  Further, Mr. Woods stated that "whenever a black company would apply [to be on] the towing list," DPIE officials would inspect his property.  ECF No. 32-9, at 15.

B.     **First NAB Proceeding**

In March 2023, several individuals from the DPIE lodged a complaint with the NAB regarding Plaintiffs' property.  ECF No. 32-16.  In it, they described three instances of alleged nuisance.  The first, dated May 4, 2021, reported "[n]umerous complaints from county government, police and citizens" regarding "wrecked, dismantled, or unlicensed vehicles stored on [the] public access road adjacent to [the property]."  *Id.* at 1.  It further stated the property was "not maintained in a clean, safe or secure manner."  *Id.*  The remaining two instances described similar conditions, but alleged the problems were "[o]ngoing."  *Id.*

---

[1] The parties do not provide greater detail regarding when this protest occurred or what exactly Mr. Woods stated.

The NAB scheduled a public hearing on the complaint for April 27, 2023.  ECF No. 31-4, at 2.  The agency provided Plaintiffs notice via certified mail and a physical posting on Collision Towing's premises.  ECF No. 31-6, at 1.  Mr. Woods attended the hearing without an attorney and testified in defense of his business.  ECF No. 32, at 15.  After receiving testimony from DPIE officials, Mr. Woods, and other witnesses, the NAB concluded that the property constituted both a neighborhood nuisance and a public nuisance as defined by the County Code.  ECF No. 31-6, at 2-9.  It issued a Decision and Order to this effect, in which it further found that Plaintiffs "failed or refused to cooperate with attempts to abate the nuisance."  *Id.* at 9.

As a penalty, the NAB ordered Plaintiffs to "immediately discontinue any and all activities that constitute a nuisance," closed the business "until all code violations [were] corrected," and levied a $1,000 civil monetary fine.[2]  *Id.* at 10.  It directed Plaintiffs to remove "all vehicles" in excess of the number permitted by their use and occupancy permits.  *Id.*  Further, it imposed as a condition of reopening the requirement that the Health Department "inspect oil and other liquid solution on [the] surrounding land" as well as "re-inspect[ion] by DPIE."  *Id.*  Per the Prince George's County Code, the order was limited in effect to a period not to exceed one year.  Pr. George's Code, § 14-173(d)(1)(B).

C.    **Plaintiffs' Initial Attempts to Abate**

Plaintiffs attempted to remedy the issues with the property.  ECF No. 31-8, at 2-3; ECF No. 32-13, at 11.  However, in response to the NAB's closure order, DPIE padlocked all the

---

[2] Specifically, the Order required Plaintiffs to: "remove all unauthorized vehicles by a licensed tow truck company, remove all vehicles other than the [fifteen] per[mitted by the Use & Occupancy permit], remove illegal display and unauthorized signage, remove unauthorized signage on tow trucks, obtain proper permits via State and/or Government requirements, obtain required license and registration from the MVA to operate a tow truck company, and correct all safety/life safety issues."  ECF No. 31-6, at 10.

entrances to the property.  ECF No. 32-18, at 6.  This created a challenge because Plaintiffs could not access the property unless a DPIE representative physically unlocked the access points.  *Id.* According to Mr. Woods, he hired a consultant to test the soil—presumably to comply with the NAB's order requiring inspection of liquids in the surrounding land.  ECF No. 32-9, at 20.  He attempted to schedule the test five times, but was stymied on each occasion because DPIE did not unlock the gates.  *Id.*; *see also id.* at 6 ("[DPIE] would never open the gate. They would never come").

### D.    Second NAB Proceeding

On August 2, 2023, DPIE submitted a second nuisance complaint to the NAB concerning the property.  ECF No. 31-4, at 2.  The NAB set a hearing for September 21, 2023.  *Id.*  The NAB provided notice of the hearing via mail and physical posting on the premises.  ECF No. 31-8, at 1.  Mr. Woods attended the hearing alongside counsel, who argued against continued closure.  *Id.* at 3; ECF No. 32, at 15.  Once again, the NAB heard testimony from DPIE officials, from Mr. Woods, and from other witnesses.  ECF No. 31-8, at 2-3.

Mr. Woods detailed the challenges he faced accessing the property.  ECF No. 31-8, at 2-3. He stated that a DPIE representative told him "early" in the process that "she c[ouldn't] keep coming down . . . every day to open the gate for us to clean up."  ECF No. 32-13, at 11.  Although the NAB specified the required changes, Plaintiffs' limited access prevented them from complying with the order.  *Id.*  Mr. Woods explained that on one occasion, he called DPIE repeatedly but "they never came" to unlock the gates.  *Id.*  He further stated that even when DPIE did arrive, they only allowed "three or two hours" of access, which was insufficient to alleviate the identified issues.  *Id.* at 12.

During the hearing, the NAB Chair noted the "need to move on [from] questioning because [the NAB] h[as] another case," but made clear she "want[ed] to give everyone ample time to present [their] information." *Id.* at 10. In his deposition, Mr. Woods stated that during the hearing, the Chair "cut him and his attorney off," ECF No. 32, at 19, "stop[ing] [him] from presenting all of [his] evidence," ECF No. 32-9, at 19.

In its second Decision and Order, the NAB concluded that "none" of the prior violations identified in the April 2023 order had been abated—as a result, "the previous [closure] order" remained in effect. ECF No. 31-8, at 5. The NAB further instructed DPIE officials to "continue to inspect the property and make the owner aware that he must call to schedule clean up" more than a day in advance. *Id.* Neither of the NAB's orders informed Plaintiffs of their right to appeal. ECF No. 31-6 (April 2023 Decision and Order); ECF No. 31-8 (September 2023 Decision and Order).

E.    **Plaintiffs' Continuing Efforts to Abate**

Plaintiffs continued attempting to address the issues with the property. *See* ECF No. 32-20. On December 7, 2023, Plaintiffs' counsel emailed DPIE requesting re-inspection because "the property [was] in a condition that DPIE and NAB would find sufficient to lift the closure order." *Id.* Plaintiffs had "removed all unauthorized vehicles from the premises, relocated his dumpster to mitigate against the illegal dumping of trash and debris . . . , cleaned up substantial amounts of trash and debris from the premises, and removed unauthorized signage." *Id.* Moreover, counsel stated that Mr. Woods had met with DPIE official Larry Long and Mr. Long had indicated the property could be reopened. *Id.*; ECF No. 32-9, at 6-7, 21 (Mr. Woods stating, during his deposition, that Mr. Long had "seen nothing wrong" on the property, that Mr. Long told a colleague "the place was approved to be open," and that Plaintiffs completed "everything" Mr. Long told

them to do).[3]  No DPIE or NAB representative responded to the email.  ECF No. 32, at 20; ECF No. 32-3, at 11-15.

### F.    Sale of the Property

At some point, Plaintiff sold his business.  ECF No. 32, at 23; *see* ECF No. 32-18, at 3. The parties do not specify when the sale occurred, although the Amended Complaint indicates Plaintiff sold the property after "more than eight months" of closure.  ECF No. 13, at 2.  After the sale, DPIE removed the padlocks for "the new owner."  ECF No. 32-18, at 3.

### III. Procedural Background

Plaintiffs filed the Complaint in the present lawsuit on February 28, 2024, and subsequently amended it several months later.  ECF Nos. 1, 13.[4]  Plaintiffs allege (I) the NAB's enforcement actions violated the Takings Clause of the Fifth Amendment to the U.S. Constitution; (II) NAB members singled out Plaintiffs in enforcement proceedings, treating them differently from other similarly situated individuals in violation of the U.S. Constitution's Fourteenth Amendment Equal Protection Clause; (III) that these actions also violated the Maryland Declaration of Rights and Maryland Constitution; (IV) and, in the alternative, the NAB's actions violated the "substantive component" of the Due Process Clause of the Fourteenth Amendment  that "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." ECF No. 13, at 20-25.  In relief, Plaintiffs seek a declaration affirming their constitutional rights,

---

[3] This description of events is disputed: in his deposition, Mr. Long states that although Mr. Woods was "working on" abating the violations, he nonetheless "was [not] conforming to the order that the [NAB] had given him."  ECF No. 32-18, at 3-4.

[4] Plaintiffs initially named as Defendants Prince George's County and the individual members of the NAB. ECF No. 1, at 1.  When they amended the Complaint, they removed the additional defendants such that only the County remained.  ECF No. 13, at 1.

as well as the rights of others similarly situated, in addition to damages, attorneys fees, and costs. *Id.* at 26-27.

Defendant filed an answer on April 12, 2024, denying liability and the case proceeded to discovery. ECF No. 15. On May 2, 2025, Defendant filed its Motion for Summary Judgment. In their Response, Plaintiffs "withdr[e]w their state claims set forth in Count III of the Amended Complaint," and acknowledged their state claims were barred by administrative exhaustion requirements. ECF No. 32, at 26 n.2, 27 n.5. The parties fully briefed the three remaining claims; the Motion is now ripe for decision. ECF Nos. 31, 32, 33.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998). "A party who bears the

burden of proof on a particular claim must factually support each element of his or her claim."
*Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007).  Thus,
on those issues on which the nonmoving party will bear the burden of proof, it is his or her
responsibility to confront the motion for summary judgment with an affidavit or other similar
evidence.  *See Anderson*, 477 U.S. at 256–57.

**ANALYSIS**

The Court begins by addressing Defendant's challenge to jurisdiction, concluding it has
authority to hear the case.  It then analyzes Plaintiffs' three claims in turn, finding they fail to raise
a genuine dispute of material fact as to each.

## I.    Jurisdiction

The Court has jurisdiction over Plaintiffs' constitutional claims because they arise under
federal law, 42 U.S.C. § 1983.[5]  ECF No. 13, at 20-27; *see* 28 U.S.C. § 1331.  Defendant argues
the Court lacks subject-matter jurisdiction, citing *Sansotta v. Town of Nags Head*, 724 F.3d 533
(4th Cir. 2013) for the proposition that a plaintiff must litigate a takings claim in state court prior
to seeking relief in federal court.  ECF No. 31-1, at 16.  As Plaintiffs note, the Supreme Court
eliminated this so-called state-litigation requirement in *Knick v. Township of Scott*, 588 U.S. 180,
189 (2019).  ECF No. 32, at 27.  "A property owner has an actionable Fifth Amendment takings
claim when the government takes his property without paying for it . . . and therefore may bring
his claim in federal court under § 1983 at that time."  *Knick*, 588 U.S. at 185.  Thus, there is no
jurisdictional bar to Plaintiffs' claims.

---

[5] The Court must first assure itself that it has subject-matter jurisdiction over the claim.  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).

12

## II.    Takings

"The Fifth Amendment to the Constitution, incorporated to the states via the Fourteenth Amendment, provides 'private property [shall not] be taken for public use, without just compensation.'" *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364 (4th Cir. 2020) (quoting U.S. Const. amend. V).  Accordingly, when raising violations of the Takings Clause, a plaintiff must establish both a property interest and a "taking." *Brady v. City of Myrtle Beach*, 137 F.4th 233, 238 (4th Cir. 2025).  Plaintiffs establish a property interest.  However, viewing the facts in the light most favorable to Plaintiffs, they cannot make out a taking.

### A.    Property Interest

"Because the [Takings] Clause itself does not define 'property,' the Supreme Court has long understood the term to protect existing property interests 'that stem from an independent source such as state law,' or 'traditional property law principles.'" *Id.* (first quoting *Philips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998), then quoting *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023)).

Plaintiffs have a constitutionally protected ownership interest in their land, as well as the right to access their property.  *See id.* at 239 (stating plaintiffs had a "property interest in their leaseholds" and ownership rights); *Sansotta*, 724 F.3d at 541 n.9 (explaining "the right to use property is often considered part of the bundle of property rights").  However, these rights are not limitless—Plaintiffs did not possess a right to operate their business or to engage in nuisance.  *Brady*, 137 F.4th at 239 ("[T]he Supreme Court has been clear that "*the activity of doing business, or the activity of making a profit* is not property" quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in original)); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (explaining "a landowner . . . never ha[s] a right to

engage in [a] nuisance"); *Sansotta*, 724 F.4th at 541-42 (same). The same is true under Maryland law—"a right to maintain a nuisance does not exist." *Erb v. Md. Dep't of Env.*, 676 A.2d 1017, 1027-28 (Md. 1996). Nonetheless, Defendant prevented Plaintiffs from accessing and using the property by padlocking entry points. ECF No. 32-18, at 6. Accordingly, the takings analysis may proceed under that theory. *See Brady*, 137 F.4th at 239 (suggesting plaintiffs would have a property interest for purposes of a takings claim if defendant had interfered with their "right to possess their land pursuant to their leases" or ownership interests).

### B.    Taking

With respect to "taking," "the Supreme Court has been clear that the government can 'take' property in two distinct ways": via physical acquisition or through the imposition of use restrictions that limit "an owner's ability to use his own property." *Brady*, 137 F.4th at 239; *Cedar Point*, 594 U.S. at 147-48.[6] Further, there are two types of use restrictions: per se and ad hoc. "If a use restriction denies the owner all economically beneficial use of the land, then the restriction has gone too far and—under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)— the government has made a per se taking." *Blackburn v. Dare Cnty.*, 58 F.4th 807, 810 (4th Cir. 2023). However, such extreme restrictions are rare. *Id.* Typically, courts analyze use-restriction takings claims under the *Penn Central* ad-hoc test: "a fact-specific inquiry that turns on the

---

[6] In *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), the Supreme Court updated the analytical framework applicable to Fifth Amendment Takings Clause claims. "Before *Cedar Point*, takings were either 'physical' or 'regulatory,'" and regulatory claims were further subdivided into per se regulatory takings or takings subject to the multi-factor balancing test established in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Blackburn v. Dare Cnty.*, 58 F.4th 807, 810 n.3 (4th Cir. 2023). The Fourth Circuit adopted "the physical-appropriation versus use-restriction dichotomy used in *Cedar Point*," to heed to the Supreme Court's warning "that the regulatory-takings label 'can mislead.'" *Id.* (quoting *Cedar Point*, 594 U.S. at 149); *see also Brady*, 137 F.4th at 239 (applying *Cedar Point* framework to Fifth Amendment Takings claim). This Court follows suit, despite the parties' use of older tests.

'economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action.'" *Brady*, 137 F.4th at 238 (quoting *Cedar Point*, 594 U.S. at 148). Viewing the record in the light most favorable to Plaintiffs, they cannot establish a taking by Defendant.

### 1.    Physical Acquisition

Plaintiffs do not claim a taking by physical acquisition. *See* ECF No. 32. A taking by physical acquisition occurs when the state "authorize[s] government officials or third parties to physically occupy or possess" the property. *Blackburn*, 58 F.4th at 811. "[T]emporarily excluding an owner from their own property," like Defendant did here, does not qualify. *Id.*

### 2.    Use Restriction—Per Se

Plaintiffs cannot establish a per se taking because this is not the rare case in which a use restriction eliminates all economically beneficial use of the land. The Supreme Court has limited its per se takings rule to "the 'extraordinary case' in which a regulation *permanently* deprives property of all value."[7] *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002) (emphasis added). For example, in *Tahoe-Sierra Preservation Council, Inc. v.*

---

[7] Plaintiffs describe two subcategories of *per se* takings: "(1) takings that deprive an owner of 'all economically beneficial uses' . . . and (2) takings that force the owner to suffer a 'permanent physical occupation' of the subject property." ECF No. 32, at 28 (first quoting *Lucas*, 505 U.S. at 1019, then quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982)). This misstates the law. The first category refers to the *Lucas* rule, which requires compensation when a regulation "permanently deprives property of all value"—meaning a temporary restriction does not qualify. *Tahoe-Sierra*, at 332. The second category identified constitutes *physical* takings where "the government physically acquires private property for public use." *Cedar Point*, 594 U.S. at 147-48. Distinct from use restrictions, physical takings are always subject to "a simple, per se rule: The government must pay for what it takes." *Id.* Accordingly, the duration of a physical occupation "bears only on the amount of compensation," not on the initial analysis of whether a taking has occurred at all. *Id.* at 153; *see also id.* at 158 (explaining that in *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979), the Supreme Court "concluded categorically that the government must pay just compensation for physical invasions" of any type).

*Tahoe Regional Planning Agency*, the Supreme Court found the per se rule did not apply to a thirty-two-month moratorium on development for a parcel of land.  *Id.* at 331-32.  The same was true in *Blackburn v. Dare County*, where the Fourth Circuit found a restriction preventing non-residents from accessing their properties for forty-five days did not constitute a per se taking because it was temporary.  58 F.4th at 812 (citing *Tahoe-Sierra*, 535 U.S. at 332).  Defendant temporarily closed Plaintiff's business, pursuant to County regulations, for the time during which the nuisance persisted, up to a maximum period of one year.  ECF No. 31-6 (April 2023 Decision and Order); ECF No. 31-8 (September 2023 Decision and Order); Pr. George's Code, § 14-171(d)(1)(B).  Accordingly, Defendant did not commit a per se taking.

### 3.    Use Restriction—Ad Hoc

Finally, Plaintiffs cannot meet their burden under the *Penn Central* test because two of the three relevant factors weigh in favor of Defendant and against finding that a taking occurred.

**Economic Impact of the Regulation.** The first *Penn Central* factor assesses the economic impact of the regulation on the claimant by "weigh[ing] the diminution in value that the [closure order] caused to the property against the value of the [property] unburdened by [Defendant's] order." *Blackburn*, 58 F.4th at 812.  "[P]revailing on this factor requires that a plaintiff allege that the challenged regulation caused a *substantial* diminution in value to the related property."  *Id.* (emphasis in original).  "The Fourth Circuit has found that 'a hypothetical 83 percent diminution in value was insufficient to establish a regulatory taking' and noted its sister circuits' findings that no [ad-hoc use-restriction] taking occurred 'when presented with diminutions in value of 75 percent and 92.5 percent.'"  *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.*, 563 F. Supp. 3d 428, 443 (D. Md. 2021) (quoting *Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 354 (4th Cir. 2021)).  To demonstrate economic impact, Plaintiffs point to

Mr. Woods's deposition testimony stating the closure order caused him to lose accounts for car towing and storage services with numerous insurance companies. ECF No. 32-9, at 10-11. Plaintiffs built these relationships over twenty years of business. *Id.* Mr. Woods further stated that he suffered approximately five or six million dollars in damages because of the closure of the business.[8] *Id.* at 13-14. Plaintiffs sold the property at some point but do not specify how the sale price compared to the property value prior to the imposition of the closure order. Plaintiffs' ability to sell the land, however, demonstrates it retained *some* economic value. Moreover, the NAB's closure order would expire either by abatement or the passage of one year, at which point the property could regain additional economic value. ECF No. 31-6, at 10 (April 2023 Decision and Order); ECF No. 31-8, at 6 (September 2023 Decision and Order); Pr. George's Code, § 14-171(d)(1)(B). In fact, the record indicates DPIE removed the padlocks on the property for the new owner, suggesting the exclusion did not persist after the sale. ECF No. 32-18, at 3. In sum, while Plaintiffs suffered negative economic impact, the record does not reflect the type of economic devastation required to prevail on this factor.[9] *See Willowbrook*, 563 F. Supp. 3d at 442-43.

**Investment-Backed Expectations.** The second factor, considering Plaintiffs' "investment-backed expectations" for use of the property, weighs in favor of Plaintiffs. *Penn*

---

[8] Plaintiffs' references to "closure" of the business are ambiguous; it is unclear whether Mr. Woods is commenting on the impact of the NAB's closure order, or the eventual closure and sale of Collision Towing. Drawing all inferences in favor of the nonmoving party, *Tinsley*, 155 F.3d at 438, the Court assumes Plaintiffs mean to reference the closure order.

[9] Outside of evidence related to procedural deficiencies in the NAB's work, Plaintiffs rely largely on the testimony of Mr. Woods. While his testimony is helpful, Plaintiffs would have benefitted from presenting additional evidence such as, for example, the contracts that were lost, an expert valuation of the value of the property before closure, and/or a bill of sale explaining the amount it was sold for. A plaintiff's testimony is powerful evidence, but unless sufficiently detailed, may not be enough to defeat a Motion for Summary Judgment depending on the nature of the claim.

*Cent.*, 438 U.S. at 124. "This inquiry is informed by 'the existing use of the property,' and the 'law in force in the State in which the property is located' at the time of the challenged government action. *Willowbrook*, 563 F. Supp. 3d at 443 (first quoting *Nat'l Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1162 (4th Cir. 1991), then quoting *Ark. Fish & Game Comm'n v. United States*, 568 U.S. 23, 38 (2012)). In other words, the Court must put itself in the shoes of Plaintiffs at the time of the challenged action and consider whether they could reasonably expect the government to pursue nuisance abatement proceedings in the manner it did. *See id.*; *Pulte Home Corp. v. Montgomery Cnty.*, 271 F. Supp. 3d 762, 777 (D. Md. 2017).

This Court's decision in *Willowbrook Apartment Associates, LLC v. Mayor & City Council of Baltimore* effectively illustrates the rule's application. 563 F. Supp. 3d at 443-44. There, the Court considered the reasonable, investment-backed expectations of landlords subject to temporary legislation prohibiting any increase in rent or assessment of late fees to tenants. *Id.* at 437, 443-44. This factor weighed "slightly in favor" of the landlords, because although the affected area—the landlord-tenant relationship—traditionally involved "significant regulation," "housing providers were not generally subject to blanket, exception-free restrictions" of the type imposed. *Id.* at 443-44. Accordingly, while the landlords could reasonably expect *some* regulation, the breadth and extremity of the type imposed exceeded what a reasonable person could have predicted. *Id.*

Turning to the circumstances at issue here, while Plaintiffs could reasonably expect Defendant to pursue nuisance abatement proceedings against them, and even to subject them to a closure order, they could not have foreseen the procedural deficiencies that plagued the NAB. As previously discussed, Defendant's police powers support action to abate conditions that it reasonably believes constitute a nuisance. *Lucas*, 505 U.S. at 1029; *see also Adams v. Commr's*

*of Town of Trappe*, 102 A.2d 830, 836 (Md. 1954) (explaining the government "has the authority to abate nuisances in the exercise of its police power" and to "delegate to administrative officers the authority to determine whether certain things constitute public nuisances" or "declare that to be a nuisance which is detrimental to the health, morals, or welfare of the citizens").  Accordingly, any reasonable landowner could have expected to be brought before the NAB if the government identified circumstances that it believed constituted nuisance on their property.  Here, the parties agree that Plaintiffs had "wrecked and dismantled vehicles on the property," that "Mr. Woods . . . was buying junk cars, trucks, and buses and had signage that advertised this business," and that Plaintiffs' committed code violations.  ECF No. 32, at 15-16, 33.  As such, Plaintiffs should have expected involvement with the NAB process, and with that, the risk of temporary closure of Collision Towing.  However, significantly, a reasonable property owner would expect the NAB to follow the law and adhere to the County Code's requirements.  To the extent the NAB failed to do so—for example, by failing to accompany all nuisance complaints with a sworn affidavit—Plaintiffs show interference with their investment-backed expectations.  Accordingly, this factor weighs in favor of Plaintiffs.

      **Character of the Regulation.**  Finally, the third factor—the character of the government regulation—also weighs in favor of Defendant.  *Penn Cent.*, 438 U.S. at 124.  Although somewhat duplicative of prior analysis, this factor "seek[s] to 'identify regulatory actions that are functionally equivalent to the classic taking.'"  *Blackburn*, 58 F.4th at 814.  As such, courts consider whether the use restriction "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good."  *Willowbrook*, 563 F. Supp. 3d at 444 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986)).  If so, a restriction is unlikely to constitute

a taking.  *Id.*  The court may also consider "the distributional impact of the order."  *Blackburn*, 58 F.4th at 814.

Defendant's nuisance abatement regime does not resemble a classic taking.  The Supreme Court has characterized nuisance regulations and enforcement as "longstanding background restrictions on property rights" that regulate individual behavior for the public benefit.  *Cedar Point*, 594 U.S. at 160.  The County Code explicitly invokes this purpose, making clear that the NAB exercises "the County's police power that is reasonable and necessary to protect the health, safety, and general welfare of the citizens."  Pr. George's Code, § 14-170(b).  The NAB's powers apply equally to all Prince George's County property owners.  "Such broad-based regulation is less likely to be a taking if it provides reciprocal benefits to the regulated parcel" by similarly "restrict[ing] the use of other nearby parcels."  *Blackburn*, 58 F.4th at 815-16.  Finally, the Fourth Circuit has held that a temporary restriction on access to one's property is not the functional equivalent to government appropriation of private property.  *Id*.

*        *        *

"[T]here is no hard and fast way to weigh" the *Penn Central* factors.  *Id.* at 815.  Nonetheless, the Supreme Court has stated that the "inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."  *Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528, 540 (2005).  Plaintiffs' argument that the NAB's process was infected with procedural deficiencies— such as a lack of members with specialized legal training, as well as the failure of NAB members to accompany complaints with sworn affidavits—is well-taken.  ECF No. 32, at 31-32.  Such concerns, however, do not change the fact that Plaintiffs' deprivation is not similar to a classic taking: the government did not acquire the property, the property retained economic value, and the

closure was temporary in nature.  *See Willowbrook*, 563 F. Supp. 3d at 444 (analyzing character of government regulation forbidding landlords from raising rents and collecting late fees and reasoning "it is also significant that the nature of the Acts here are 'uncharacteristic of a regulatory taking'" (quoting *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006))).  Accordingly, Plaintiffs have not created a genuine dispute of material fact as to whether they experienced a taking under *Penn Central*.  As noted above, a more detailed economic analysis or factual presentation in support of the first *Penn Central* factor may well have led to a different result.

### III.    Equal Protection—Class of One

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).  To this end, "[t]he Supreme Court has recognized the validity of 'class of one' Equal Protection claims, 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Willis v. Town of Marshall*, 426 F.3d 251, 262 (4th Cir. 2005) (quoting *id.*).

Plaintiffs argue Defendant singled out Collision Towing in retaliation for Mr. Wood's public statements regarding racial disparities in the Police Vendor list.  ECF No. 32, at 32-34.  Defendant moves for summary judgment on the grounds that the record lacks evidence to support Plaintiffs' claim of differential treatment.  ECF No. 31-1, at 17-19; ECF No. 33, at 4-6.  Although Plaintiffs generally reference each element, they fail to meet their burden to "proffer specific facts to show a genuine issue exists for trial." *Layani v. Ouzana*, No. SAG-20-420, 2024 WL 5088747,

at *3 (D. Md. Dec. 12, 2024); *see also* Fed. R. Civ. P. 56 (c)(1).  Accordingly, the Court shall grant summary judgment to Defendant on this claim, as well.

"An entity is 'similarly situated' if it is 'in all relevant respects alike' to the Plaintiff." *CMDS Residential, LLC v. Mayor & City Council of Baltimore*, 714 F. Supp. 3d 583, 619 (D. Md. 2024) (quoting *Lowe v. City of Charleston*, 597 F. Supp. 3d 855, 860 (D.S.C. 2022)).  For example, in *Willis v. Town of Marshall*, the defendant barred plaintiff from dancing at musical concerts because she "danced in a sexually provocative manner."  426 F.3d at 254.  Plaintiff brought a successful class-of-one claim by identifying comparators "who danced or dressed similarly," including her own dance partner, that the defendant did not punish.  *Id.* at 263.

Plaintiffs allege neighboring businesses—also auto repair shops—constitute sufficient comparators, but the record does not show they were similarly situated.  ECF No. 32, at 33. Presumably, Plaintiffs' neighbors did not publicly comment on the lack of racial diversity on the Police Vendor list.[10]  Applying the logic of *Willis*, Plaintiffs' neighbors could be similarly situated if, for example, they committed similar code violations, but DPIE did not issue them citations or file a nuisance complaint against them.  Alternatively, a business could be similarly situated if the NAB called a hearing regarding their property, found similar code violations, but chose not to impose a closure order.  However, the record is devoid of any information regarding Plaintiffs' neighbors.  Plaintiffs present no information regarding the nature of their violations, whether DPIE submitted nuisance complaints against them, or if NAB issued closure orders to them.  The one concrete fact in the record—on which the parties agree—is that DPIE officials did inspect Plaintiffs' neighbors and issued them citations for violations, just like they did Collision Towing.

---

[10] Plaintiffs do not explicitly state this, but the Court assumes this fact in light of its obligation to draw all inferences in favor of the non-moving party.  *Tinsley*, 155 F.3d at 438.

ECF No. 31-9, at 3; ECF No. 32, at 15-16.   Accordingly, the record is devoid of evidence of differential treatment.

Plaintiffs' unsupported assertions to the contrary do not constitute evidence sufficient to withstand summary judgment.  *Layani*, 2024 WL 5088747, at *1.  In their response brief, Plaintiffs aver that although their neighbors were cited, they "were not subjected to closure orders" or nuisance complaints like Collision Towing.  ECF No. 32, at 33.  They further note that one immediate neighbor—also an auto body repair shop—had "significant amounts of trash, debris, and damaged vehicles scattered throughout its premises," similar to the allegations against Collision Towing.  *Id.*  The Court cannot consider these unsupported assertions because they do not satisfy Rule 56.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record); *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (explaining that to survive summary judgment, "plaintiffs need to present more than their own unsupported speculation and conclusory allegations"); *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) ("The Federal Rules of Civil Procedure require parties to cite all evidence in support of their positions at summary judgment.").  Accordingly, Plaintiffs have failed to support their equal protection claim as a matter of law.

### IV.    Substantive Due Process

The Due Process Clause of the Fourteenth Amendment forbids "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  Plaintiffs bring a claim in substantive due process, a "narrow[] concept" that "serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions."  *Front Royal & Warren Cnty. Indus. Park Corp. v.*

*Town of Front Royal*, 135 F.3d 275, 288 (4th Cir. 1998) (quoting *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995)) (emphasis in original). "Substantive due process protections run only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post deprivation state remedies." *McLamb v. City of Mount Rainier*, No. DKC-23-3365, 2024 WL 4108570, at *8 (D. Md. Sept. 6, 2024) (quoting *Tri-Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 441 (4th Cir. 2002)). To establish a violation of substantive due process, a plaintiff must "demonstrate (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *MCL Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (emphasis in original). "Plaintiffs would, therefore, need to show that [Defendant's actions] 'lack any conceivable rational relationship to the exercise of the state's traditional police power.'" *Willowbrook*, 563 F. Supp. 3d at 448 (quoting *Siena Corp. v. Mayor and City Council of Rockville*, 873 F.3d 456, 464 (4th Cir. 2017)).

Plaintiffs cannot meet this high bar because the state's action falls within its legitimate police powers to limit nuisances, and the NAB found that the property constituted a nuisance. Plaintiffs argue that their code violations were "common" and "d[id] not constitute a public nuisance" pursuant to the County Code definition. ECF No. 32, at 38. They again point to procedural deficiencies within the NAB broadly, including the contention that a DPIE Inspector believes "any code violation is considered a nuisance." *Id.* They do not, however, explain why the facts at issue *here* fail to constitute nuisance. It is undisputed that Plaintiffs had "wrecked and dismantled vehicles on the property," that "Mr. Woods . . . was buying junk cars, trucks, and buses

and had signage that advertised this business," and that these actions, among others, constituted County Code violations.  ECF No. 32, at 15-16, 33.  This at least arguably meets the County definition of nuisance, as established in Section 14-171(a)(7)(F), as a premises used to "obstruct the quiet enjoyment and reasonable use of the property of persons in a particular area."  Pr. George's Code, § 14-171(a)(7)(F).[11]  As previously explained, it is well-accepted that the state may act expeditiously to abate a nuisance for the public good.  *Cedar Point*, 594 U.S. at 160; *Sansotta*, 724 F.3d at 541 (explaining "actions to abate a nuisance were reasonable . . . uses of [a government's] police power" even if the exercise of authority was "mistaken").

Nor have Plaintiffs shown that "their post-deprivation remedies are inadequate to rectify any taking of their property."  *Awkward v. Md.-Nat'l Cap. Park & Plan. Comm'n*, No. RWT-08-1562, 2011 WL 2896005, at *3 (D. Md. July 15, 2011).  Plaintiffs devote the majority of their argument to deficiencies in the NAB process.  ECF No. 32, at 36-39.  Specifically, they point to the following: none of the current members of the NAB have legal training; the process for approving NAB members is cursory; the NAB lacks procedures dictating how precisely members carry out their duties; the County's failure to present nuisance complaints together with a sworn affidavit when making the initial determination as to whether to convene a hearing; NAB

---

[11] Plaintiffs specifically argue "that the NAB's decisions lacked a rational connection to the statutory definition of public nuisance."  ECF No. 32, at 38.  For the reasons described in the text, multiple County Code violations bear at least some rational connection with the statutory definition of nuisance.  Additionally, the NAB's legal finding may be subject to at least some deference from this Court.  *See University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986) (holding that "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts"); *Concerned Citizens of Cloverly v. Montgomery Cnty. Planning Bd.*, 274 A.3d 1144, 1158 (Md. 2022) (explaining that courts conducting review of an agency decision accord the agency some deference, particularly when "construing a law that the agency has been charged to administer").

members fail to review complaints in full when voting on whether to convene a hearing; DPIE did not provide Mr. Woods its evidence prior to the NAB hearing; and the NAB Chair "cut[] off" Mr. Woods's testimony at the hearing.[12]  *Id.*  They do not, however, address any purported failures of post-deprivation remedies—like the right to appeal any NAB decision to the Circuit Court for Prince George's County.  Pr. George's Code, § 14-175; ECF No. 32, at 36-39.  "Accordingly, because Plaintiffs cannot show that post-deprivation state processes are incapable of rectifying any injury that the [NAB] has arbitrarily inflicted upon them," the record cannot support their substantive due process claim.  *Awkward*, 2011 WL 2896005, at *3.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment, ECF No. 31, is granted.  The Clerk's Office shall close the case.

So ordered.

Dated: August 19, 2025                                    _____/s/_____
                                                                         Ajmel A. Qureshi
                                                                         United States Magistrate Judge

---

[12] Such arguments sound more in the realm of procedural due process, which Plaintiffs do not raise in their Amended Complaint or in their Response to the Motion for Summary Judgment.  *See generally* ECF No. 13, at 24-27; ECF No. 32.